**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDRES CAZARES, as Special | ) | |
| Administrator of the Estate of ANDREW | ) | |
| CAZARES, deceased and | ) | |
| | ) | |
| FAUSTO T. MANZERA, as Special | ) | |
| Administrator of the Estate of FAUSTO A. | ) | |
| MANZERA, et al., | ) | |
| Plaintiffs, | ) | Case No. 13 C 5626 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| JOSEPH FRUGOLI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 10, 2009, Andrew Cazares and Fausto A. Manzera, two college-aged men, were killed when Joseph Frugoli, an intoxicated off-duty Chicago Police Detective, crashed into their car that was stopped on a Chicago expressway. Plaintiffs Jose Cazares and Fausto T. Manzera, as special administrators of the estates of Cazares and Manzera, respectively, sued Frugoli[1] and Frugoli's employer, the City of Chicago ("Chicago" or "the City").[2] The Plaintiffs argue that Frugoli and Chicago should be held responsible for Cazares' and Manzera's wrongful deaths. Specifically, in Count IV of Cazares' and Manzera's Fifth Amended Complaints, the Plaintiffs allege that the City should be held responsible for the deaths pursuant to 42 U.S.C. § 1983 under a theory of municipal liability. (Dkt. Nos. 86, 87); *see Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2036 (1978) (municipal bodies may be

---

[1] Plaintiffs are also pursuing state law claims against Frugoli.

[2] Plaintiffs also brought a Dramshop Act claim against John Moran, Primero, Inc., and Metropolitan Bank Land Trust 1463, the owners of Dugan's, one of the bars Frugoli drank at before the collision. Plaintiffs settled with the Dramshop defendants and their claims against them were dismissed on December 14, 2016. (*See* Dkt. 339.)

sued for constitutional deprivations caused by governmental custom). Plaintiffs allege the City violated the decedents' substantive due process right to bodily integrity through the City's *de facto* policies of failing to investigate or prosecute police officer misconduct and the Chicago Police Department's code of silence, which led Frugoli to drive drunk without fear of consequences. Under current consideration are Chicago's Motions to Bar the Plaintiffs' three proposed expert witnesses and its Motion for Summary Judgment. Chicago's Motions to Bar Plaintiffs' Expert Witnesses is granted in part and denied in part. For the reasons discussed herein, Chicago's Motion for Summary Judgment is denied.

## FACTS

In the early hours of April 10, 2009, Joseph Frugoli, an off-duty Chicago Police Department ("CPD") Detective, got behind the wheel of his Lexus SUV after spending the majority of the evening drinking at two different bars for approximately 4-5 hours. (Def. 56.1 ¶¶ 6-8, 11-12; Dkt. 290 ¶ 8.) [3] Just after entering the Dan Ryan Expressway on Chicago's near south side, Frugoli crashed into the back of a stopped car killing its driver and passenger, Fausto A. Manzera and Andrew Cazares. (Def. 56.1 ¶¶ 20-23, 25.) Frugoli left the scene of the accident on foot, but was found and detained by Chicago Police Officers Adrienne Seiber and Todd Stremplewski approximately 15 minutes after the officers received the call about the accident. (Def. 56.1 ¶¶ 26-28; Dkt. 290-1 at 11:12-19.) When questioned by the officers, Frugoli admitted that he was in an accident and also conceded that he had been at a bar that evening. (Def. 56.1 ¶ 29) During their interview of Frugoli, the officers discovered that he was a Chicago police officer and they called for a supervisor and an ambulance because Frugoli had

---

[3] Throughout, citations to "Def. 56.1" refer to Chicago's Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment (Dkt. 285), and citations to "Pl. SOAF" refer to Plaintiffs' Statement of Additional Facts in Opposition of Summary Judgment, beginning on page 15 of Plaintiffs' Response to Chicago's Rule 56.1 Statement (Dkt. 290).

suffered a head injury in the collision and was bleeding.[4]  (Def. 56.1 ¶¶ 30-31, 33.)  Despite interviewing, handcuffing, and placing Frugoli in a squad car, Stremplewski stated that he did not notice the odor of alcohol on Frugoli or recognize any signs of his impairment.  (Pl. SOAF ¶ 2; Dkt. 285-9 at 12.)  Before the ambulance arrived to transport Frugoli, the CPD officers on the scene did not administer any of the usual driving under the influence ("DUI") tests to Frugoli and neither  recalls writing a report.  (Def. 56.1 ¶ 34.)  Paramedics who transported Frugoli to the hospital, however, noticed an odor of alcohol on Frugoli.  (Pl. SOAF ¶ 4.)  After arriving at the hospital and being tested,  Frugoli's blood alcohol content was .328 mg/dl which is  over four times the legal limit.  (Dkt. 290-13 ¶ 31.)  Two hours later, the Illinois State Police measured Frugoli's blood alcohol level at .24 mg/dl, which is three times the legal limit.  (Pl. SOAF ¶ 4.)  Frugoli was not drinking with any other CPD officers the night of the accident and testified that he was not encouraged or assisted to drink and drive that evening by any CPD officer.  (Def. 56.1 ¶¶ 9, 10, 13.)

The fatal accident involving Manzera and Cazares was not the first time Frugoli had been suspected of driving drunk.  On January 16, 2005, Frugoli rear-ended another vehicle on the Dan Ryan expressway.  (Pl. SOAF ¶ 5.)  Illinois State Trooper Kraft, who investigated the 2005 accident, later testified that he detected an odor of alcohol on Frugoli after the accident.  (*Id.*)  Frugoli admitted that he drank one beer before the accident, a practice he testified was not uncommon.  (Dkt. 299 at 11; Dkt. 285-6 at 93:14-22.)  Frugoli, who claimed he was injured in the collision, was transported from the scene of the accident to the hospital by ambulance.  (Pl. SOAF ¶ 6.)  By the time Trooper Kraft got to the hospital to continue his investigation, Frugoli had left, which prevented Kraft from performing any intoxication tests.  (*Id.*)  Trooper Kraft then

---

[4] Because the accident occurred on the Dan Ryan expressway, which is the jurisdiction of the Illinois State Police, the crash investigation was conducted by the Illinois State Police.  (Def. 56.1 ¶¶ 24, 37.)

went to Frugoli's home, where he left two traffic citations. (*Id.* ¶ 7.) When Kraft went to Cook County traffic court to prosecute the tickets, he saw Frugoli leaving and learned that the tickets had already been dismissed. (*Id.*) There is no evidence in the record that Frugoli ever reported this incident to the CPD or that the CPD was otherwise aware of the incident. (Def. 56.1 ¶ 42.)

Frugoli was also in two early morning car accidents in January 2008. On January 26, 2008, Frugoli was involved in a single car accident while on duty at 4:30 a.m. (Pl. SOAF ¶ 9.) Frugoli denied drinking the day of that accident and testified that the accident occurred after he skidded on a patch of ice and hit a curb. (Def. 56.1 ¶¶ 46-47.) CPD Sergeant Stacy Smith-Cotter investigated the crash. (Pl. SOAF ¶ 9.)

At approximately 5:00 a.m. the next day, Frugoli was involved in another accident. This time, he was off-duty when he broadsided a CPD squad car at a high rate of speed, injuring Natalie Joritz and William Orsa, the two CPD officers inside. (Def. 56.1 ¶¶ 49-50, 52; Pl. SOAF ¶ 10.) Frugoli testified that this accident resulted when he reached for his cell phone and went through a stop sign. (Def. 56.1 ¶ 50.) Frugoli denied drinking before this accident, yet, he had spent the previous six hours at a casino, appeared glassy eyed to one of the police officers he struck, and failed to inquire about their condition, render aid, or call for assistance. (Def. 56.1 ¶¶ 51, 55; Dkt. 285-6 at 25; Pl. SOAF ¶ 11.) After Joritz and Orsa were taken to the hospital by ambulance, CPD Sgt. Smith-Cotter, the same officer who had responded to the accident just 24 hours earlier,, responded to the scene with two other officers who investigated the accident. (Def. 56.1 ¶ 53; Pl. SOAF ¶ 12.) Although Frugoli was cited for the accident, he remained in Smith-Cotter's squad car, and the officer who wrote the tickets gave them to Smith-Cotter, not to Frugoli directly. (Def. 56.1 ¶ 56; Pl. SOAF ¶ 13.) The officers investigating the accident never spoke with or observed Frugoli and did not administer any intoxication tests. (Pl. SOAF ¶ 35.)

Smith-Cotter, who was the only CPD officer who spoke with Frugoli at the scene, testified that she did not test Frugoli for intoxication but stated that he did not smell of alcohol and did not appear to have been drinking. (Def. 56.1 ¶ 55.) Smith-Cotter eventually drove Frugoli home. (Pl. SOAF ¶ 13.) Neither the investigating officers nor the injured officers were ever notified of a court date for the tickets given to Frugoli. (Pl. SOAF ¶ 14.)

During the course of his career, Frugoli was also the subject of eighteen complaints regarding his on-duty behavior. (Pl. SOAF ¶ 30.) These complaints comprised 43 distinct allegations for a variety of misconduct, including excessive use of force, verbal abuse, unprofessional behavior, and illegal search. (Dkt. 290-13 ¶ 22.) None of the complaints against Frugoli resulted in any CPD disciplinary action or were otherwise sustained by the CPD. (Reiter Dep. at 143:6-10.)

When asked about the fatal accident involving Cazares and Manzera, Frugoli denied that his decision to drink and drive had anything to do with an absence of discipline from the CPD for any prior incident. (Def. 56.1 ¶ 62.) Frugoli also denied that there was any CPD policy that gave him reason to believe he could drink and drive. (*Id.* ¶ 63.) Frugoli testified that he believed that he had the same chances as any other intoxicated person of getting a DUI. (*Id.* ¶ 64.) Frugoli further testified that he knew of two other CPD officers who had been arrested for DUI and believed that one of the officers had been terminated as a result of the arrest. (*Id.* ¶¶ 58, 59.)

In December 2015, Chicago Mayor Rahm Emanuel, publicly acknowledged that a code of silence exists within the CPD, and explained that the code includes "the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues." (Pl. SOAF ¶ 37; Dkt. 290-18 at 69.) Additionally, the City created a Police Accountability Task Force to review the CPD's system of training, oversight, discipline, and transparency. (Pl. SOAF ¶ 40; Dkt. 290-

18.)  The Task Force released a report with its recommendations for reform in April 2016.  (Dkt. 290-18.)  In its report, the Task Force "found that the code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present.  The code of silence is institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City."  (Dkt. 290-18 at 70.)  After briefing was concluded, on January 13, 2017, the Department of Justice and the U.S. Attorney's Office for the Northern District of Illinois published a report detailing their investigation of the CPD for alleged civil rights violations.[5]  In its report, the DOJ found that "[i]nvestigative fact-finding into police misconduct and attempts to hold officers accountable are also frustrated by police officers' code of silence.  The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."  (DOJ Report at 8, 75-77.)

## I.  CHICAGO'S *DAUBERT* MOTIONS

In conjunction with their Motion for Summary Judgment, Chicago has moved to exclude the testimony of Plaintiffs' proposed expert witnesses:  Kristi Allgood, Dr. Geoffrey Alpert, and Lou Reiter, who were all retained to provide evidence in support of the Plaintiffs' *Monell* claims. In responding to Chicago's Motion for Summary Judgment, Plaintiffs have relied on their

---

[5] DOJ Report,  https://www.justice.gov/opa/file/925846/download.  Pursuant to Fed.R.Evid. 201, the Court is permitted to take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201.  Courts have extended this doctrine to take judicial notice of DOJ investigative reports.  *See Hope v. Pelzer*, 536 U.S. 730, 737 n.7 (2002) (approving Eleventh Circuit's judicial notice of a DOJ report "that found Alabama's systematic use of the hitching post to be improper corporal punishment"); *Daniel v. Cook Cty.*, 833 F.3d 728, 731 (7th Cir. 2016) (findings from DOJ investigation into conditions at Cook County Jail were admissible and "go a long way toward meeting a plaintiff's burden of proving an unconstitutional custom, policy, or practice" under *Monell*); *see also Dixon v. Cty. of Cook*, 819 F.3d 343, 349 (7th Cir. 2016) (reversing summary judgment for Cook County because based on a DOJ Report, along with other evidence because "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind Dixon's injury").

experts' reports. As such, the Court will evaluate the admissibility of their opinions before addressing Chicago's Motion for Summary Judgment.

## EXPERT TESTIMONY LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006)). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (quoting Fed.R.Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the Court is to "scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Id.* 689 F.3d at 805 (quoting *Kumho Tire*, 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden

of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also* Fed.R.Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified …."); Fed.R.Evid. 702 advisory committee note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed.R.Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011). Rule 702 calls for a conjunctive test and thus expert testimony must meet all four requirements to be admissible; failure on any prong is fatal to admissibility. "Each requirement has been thoroughly explored in the case law and each requires a separate analysis, although the last two—reliability of principles and methods and reliable application—are closely related." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 799 (N.D. Ill. 2013).

Thus, as a practical matter, district courts apply the *Daubert* framework described above using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning

or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers*, 629 F.3d at 644 (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). In addition, the Court will only address those opinions brought to the Court's attention and will not separately probe each expert's report and issue *sua sponte* determinations regarding the admissibility of each statement under *Daubert*. *See, e.g., Goldberg v. 401 North Wabash Venture LLC*, No. 09 C 6455, 2013 WL 212912, at *2 n.1 (N.D. Ill. Jan. 18, 2013).

## DISCUSSION

### A. Chicago's Motion to Bar Kristi Allgood (Dkt. 272)

Kristi Allgood was retained by Plaintiffs to analyze data related to CPD Complaint Registers ("CR") from alcohol-related incidents involving CPD personnel and asked to determine whether: (1) CPD employees, and in particular Frugoli, had reason to believe in 2009 that they could drink and drive with impunity or without fear of meaningful punishment; and (2) a code of silence existed in the CPD. (Dkt. 279 at 3-4.) Ms. Allgood's report analyzes the CR data in a number of ways and answers both questions in the affirmative. Chicago argues that Ms. Allgood should be barred from testifying because: (1) she is unqualified to opine on these matters; (2) her methodology is unreliable; and (3) her testimony will not aid the trier of fact, nor will it determine a factual issue. (Dkt. 273 at 12-13.) For the reasons state below, Chicago's Motion to Bar Ms. Allgood is granted in part and denied in part.

#### 1. Ms. Allgood's Qualifications

Ms. Allgood has a master's degree in public health from the University of Illinois at Chicago and a bachelor's of science degree in exercise science from Miami University. (Dkt. 279-1 at 1.) She has worked at Sinai Urban Health Institute since 2004 as an epidemiologist

where she has collected, managed, and analyzed complex community healthcare data. (*Id.*; Dkt. 273-1 at 1.) Ms. Allgood has received professional training in statistics software and has provided technical guidance for data analysis to other researchers. (Dkt. 279 at 2-3; Dkt. 279-1 at 11.) Since 2009, Ms. Allgood has also performed data analysis for various civil rights attorneys, including four cases involving the CPD, at least one of which went to trial. (Dkt. 279 at 2; Dkt. 279-1 at 1; Pl. SOAF ¶ 16.) This data analysis included evaluating complaints against CPD officers, including for excessive force and DUI. (Dkt. 279-1 at 13.) In each of these cases she analyzed CR files and associated outcomes of internal investigations. (*Id.*) Despite her previous analytical work, Ms. Allgood has never been retained as an expert in any case involving the police, other than the instant one. (*Id.*) Aside from her prior work in civil rights litigation, Ms. Allgood does not have any background, education, publications, or experience in criminal justice, criminology, law enforcement, administrative investigations, or police practices. (Dkt. 273 at 3-4, 12.)

### 2. Ms. Allgood's Data and Methodology

Ms. Allgood characterized her report as a statistical one and asserts that she was retained for her expertise in data management and analysis. (Dkt. 273 at 5; Dkt. 273-1 at 1.) Plaintiffs' counsel provided her with eighty-five files, comprising sixty-five CR files involving DUI or alcohol related complaints against CPD personnel between May 10, 2003, and April 28, 2009, and all twenty CR files involving Frugoli. (*Id.* at 4-5.) The CR files ranged from nineteen to 1,115 pages and included details about the investigations and also included evidence, communications, arrest reports, and other information. (Dkt. 279 at 3.) Ms. Allgood extracted certain data from the CR files using a data collection tool and then analyzed the data using a statistical software program called SAS. (Dkt. 279 at 8.) In analyzing and tabulating the data, Ms. Allgood employed the Wilcoxson signed-ranked test to compare medians and the Mantel-

Haenszel chi-square test to compare percentages. (*Id.* at 3; Dkt. 273-1; Dkt. 273-3 at 27.) These tests indicate whether certain occurrences are statistically significant. Her statistical analysis compared the alcohol-related incidents in a variety of ways, including comparing alcohol-related incidents involving CPD officers that happened inside of the Chicago with those that occurred outside of the city. (Dkt. 273-1.) Ms. Allgood also categorized certain incidents as involving a "Failure to Report," where there is no evidence in the CR that the subject of the investigation filed a written report regarding the DUI allegation. (273-1 at 9.) In addition to all alcohol-related incidents involving CPD officers, Ms. Allgood also analyzed all complaints against Frugoli.

### 3. Ms. Allgood's Opinions

From her statistical analysis, Ms. Allgood determined that between May 2003 and April 2009, DUI complaints against CPD officers took a median of 557 days to complete. (Pl. SOAF ¶ 17.) DUIs issued against CPD officers in Chicago mostly occurred when there was a vehicular collision with injuries and rarely occurred following routine traffic stops, while most DUIs citations against CPD officers that occurred outside of Chicago were largely the result of routine traffic stops. (Allgood Dep. 240:12-240:17.) When CPD officers were arrested for DUI outside of Chicago, it took, on average, less than one hour for the administration of an intoxication test, while it took, on average, three and a half hours inside of Chicago. (Dkt. 273-1 at 17.) When the arresting officer knew that the arrestee was a CPD officer, it took more than twice as long to measure the level of intoxication (three and a quarter hours) compared to circumstances when the arresting officer was unaware of the arrestee's status with the CPD. (Dkt. 273-1 at 13.) In 2009, CPD officers were cited with DUI at less than 10% of the rate that the general population received DUIs. (Allgood Dep. 155:10-161:10.) Ten percent of the incidents that Ms. Allgood reviewed resulted in a DUI conviction, while more than 25% resulted in a guilty finding of a

lesser charge, and 38% had an unknown disposition.  (Dkt. 273 at. 13.)  Ms. Allgood's analysis indicates that 81% of the CRs she reviewed had evidence of "Failure to Report," which primarily involved the arrested officer failing to report the incident.  (*Id.*)  Ms. Allgood also found that over 80% of the alcohol related CRs were administratively sustained against the officer.  (Dkt. 273 at 5.)  Of those complaints that were sustained, 46% of the officers received a final discipline consisting of thirty days or more suspension/separation, with 9% receiving no discipline, and 35% receiving less than thirty days of suspension/separation.  (Dkt. 273 at 5.)  Outside of the incident at the center of this lawsuit, there were eighteen complete CRs involving Frugoli.  (Dkt. 273-1 at 19.)  These CRs consisted of forty-three total allegations for conduct including excessive force, verbal abuse, unprofessional behavior, and illegal search.  (*Id.*)  None of the non-DUI complaints against Frugoli were sustained.  (*Id.*)

Based on her statistical analysis of the CR files, and the complaints filed against Frugoli, Ms. Allgood opined that CPD officers, including Mr. Frugoli had reason to believe that they could act with impunity.  Additionally, Ms. Allgood concluded that there was a code of silence at the CPD based on her identification in many of the CRs that there were no communications indicating an administrative report of the alcohol related incident.  (Dkt. 279 at 4.)

### 4. Discussion

i.  **The City primarily focuses its attack on Ms. Allgood's qualitative conclusions and largely does not challenge the results of Ms. Allgood's statistical analysis and tabulation of data. Chicago argues that Ms. Allgood lacks the background and qualifications to render her opinions, and that her conclusions were derived without scientific methodology and cannot be tested, rendering them unreliable.  (Dkt. 273 at 12-13.)  The City also challenges Ms. Allgood's opinions because they were solely based on the questions and data provided to her by Plaintiff's counsel.  (Dkt. 273 at 13.)  For the reasons discussed herein, Ms. Allgood's statistical analysis passes the threshold test of reliability under *Daubert* and Rule 702 but her conclusions regarding the existence of a code of silence in the CPD or that CPD officers felt they could drive with impunity do not.Ms. Allgood's Statistical Analysis**

As described above, the key questions in determining whether Ms. Allgood's statistical findings are admissible involve determining whether she is qualified to perform the analysis, whether her methodologies are reliable, and whether the results are relevant. *Myers*, 629 F.3d at 644; *see also* Fed.R.Evid. 702.

Ms. Allgood is qualified to perform the statistical analysis. Ms. Allgood performed relatively basic statistical tests, which included extracting data from qualitative reports and running standard and widely accepted statistical tests on the data to determine whether certain patterns involving CPD internal investigations of alcohol-related incidents were statistically significant or due to chance. Ms. Allgood has advanced training in the use of statistics software, her job as an epidemiologist requires the regular analysis and evaluation of data, and she has performed similar analysis using similar data in the past, which was found to be admissible by other courts in this district. Furthermore, the City primarily attacks her qualitative conclusions, not her ability to perform basic statistics.

Chicago also challenges the reliability of Ms. Allgood's statistical methodology in two ways: (1) her use of statistical software to perform her analysis; (2) her categorization of certain data as a "failure to report." Chicago's attempt to undermine Ms. Allgood's statistical analysis because she employed statistics software is misplaced. Chicago asserts that "[t]he computer software . . . tells her if it statistically significant or not" and that "[i]t would not be any different from anyone who purchased the SAS software and did it themselves," insinuating that any lay person could perform the tests, while later arguing that she is unqualified to reach her conclusions. (Dkt. 273 at 5.) SAS, the software used by Ms. Allgood, is a widely-accepted statistics software program that is commonly used by statisticians to perform analyses. *See, e.g.*, *Obrycka v. City of Chicago*, No. 07 C 2372, 2011 WL 2600554, at *4 (N.D. Ill. June 29, 2011).

Further, Ms. Allgood received training in SAS and used it to run widely accepted and standard statistical tests: the Wilcoxson signed-ranked test to compare medians and the Mantel-Haenszel chi-square test to compare percentages. Her use of statistics software does not convert her testimony into that of a lay person but demonstrates widely accepted and reliable methodology. Indeed, it would be more surprising if she had failed to utilize statistics software to perform her analysis.

The fact that Plaintiffs' counsel provided Ms. Allgood with her data or that she decided to categorize the data in certain ways, including creating a category of data titled "failure to report," does not render her methodology unreliable. "Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). As discussed above, her statistical methodology is sufficiently reliable to pass muster under *Daubert* and Rule 702, including the straightforward decision to create a category in the data called "failure to report" when certain information was missing in the CR.[6] The Seventh Circuit gives wide latitude to statisticians in employing "proven statistical methodolog[ies]," such as those employed by Ms. Allgood. *Id.* at 808. As such, "the selection of the variables to include" in a statistical analysis "is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Id.*; s*ee also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (reversing lower court's exclusion of

---

[6] As discussed below, Ms. Allgood will not be permitted to testify regarding the putative meaning or impact of this data categorization.

statistical analysis based on its view that the analysis did not include proper selection of variables); *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 701 & n.4 (7th Cir. 2003) (*citing Bazemore* in rejecting challenge to expert based on omission of variables in statistical analysis). Her decision to rely on data provided by Plaintiffs' counsel can very well be a subject of cross-examination or the testimony of a rebuttal expert but it is not so egregious as to render her testimony inadmissible. Similarly, her classification of the lack of certain documentation as "failures to report" can also be explored during cross examination, as it was during her deposition.

Lastly, the statistics found in Ms. Allgood's report are relevant to the Plaintiffs' case in chief. Statistical evidence that CPD officers under investigation for alcohol-related incidents were treated differently when investigated by CPD officers is relevant to establishing that a code of silence existed in the CPD. The fact that Frugoli had eighteen CRs and none of them were sustained could be relevant to the jury determining that he felt he could act with impunity as a result of the lack of investigation or discipline. Courts have regularly permitted similar types of statistical evidence when considering *Monell* claims, including in cases in which Ms. Allgood has performed analysis. *See, e.g., Obrycka*, 2011 WL 2600554, at *8 (admitting statistical analysis on which Ms. Allgood worked to support Plaintiff's *Monell* claim that Chicago "has de facto policies and practices of concealing officer misconduct, of failing to sufficiently investigate allegations of officer misconduct, and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens"). Additionally, statistical evidence of disparate treatment in other but analogous circumstances has been found to be highly relevant by the Seventh Circuit. *See, e.g.*, *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 427 (7th Cir. 2000) (noting that "ruling out chance [in disparate treatment case] was an important

step in the plaintiffs' proof, even if it was not a single leap from the starting line to the finish line").

### ii.    Ms. Allgood's Qualitative Opinions

Although she is qualified to present her statistical analysis, Ms. Allgood lacks the foundation, expertise, background, or education to opine that CPD officers, including Frugoli, felt they could drive with impunity, and that there was a code of silence within the CPD. "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'"  *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).  Ms. Allgood was retained for her expertise in data management and her analytic skills, and she characterizes her report as a statistical one.  (Dkt. 272-1 at 2.)  It is undisputed that outside of her prior litigation experience, Ms. Allgood has no training, knowledge, education, or experience regarding police departments, law enforcement policy, administrative investigations involving law enforcement, the CPD, or codes of silence.  (Dkt. 273 at 3-4.)  For these reasons, she lacks the foundation and expertise to support her qualitative conclusions.   Courts, including this one, have regularly excluded testimony for similar reason.  *See, e.g., Cage v. City of Chicago*, 979 F. Supp. 2d 787, 831 (N.D. Ill. 2013) (finding that an expert who was qualified to conduct a technical review nevertheless lacked the "requisite knowledge, skill, experience, training, or education to consider the multitude of intervening factors" relevant to some of the opinions he proffered, and barred those opinions); *Obrycka*, 2011 WL 2600554, at *6 (accepting statistical analysis but rejecting qualitative conclusions of Dr. Whitman, an expert with whom Ms. Allgood worked, because "he knows nothing about police departments, police misconduct, investigations into police misconduct, or the process by which the CPD disciplines its police officers-the subjects that lie at

the heart of this case"); *United States v. Evans*, 892 F. Supp. 2d 949, 955-57 (N.D. Ill. 2012) (allowing only part of an expert's testimony, where the expert had sufficient experience to testify as to how cellular networks operate, he did not have sufficient technical training to establish a sufficient link between those records and his conclusions). Furthermore, Ms. Allgood's qualitative conclusions should also be excluded because there "is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146; *see also United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

### B. City of Chicago's Motion to Bar Geoffrey P. Alpert (Dkt. 272)

Chicago has also moved to exclude the testimony of another of Plaintiffs' proposed experts, Dr. Geoffrey Alpert. Dr. Alpert is a Professor of Criminology at the University of South Carolina, has a Ph.D in Sociology from Washington State University, has been conducting research on police for more than thirty years, has written policies for police agencies, authored more than 150 publications in criminal justice, and is familiar with police operating procedures, as well as the customs developed by practice. (Dkt. 273-2.) Dr. Alpert is prepared to opine that Ms. Allgood's conclusions concerning the code of silence are appropriately derived from her study, which he asserts used appropriate data, an appropriate analytical scheme, and an easily understood tabular analysis. (Pl. SOAF ¶ 19; Dkt. 279-5.) Dr. Alpert, however, is not prepared to adopt her conclusions and opine that CPD officers felt that they could drive with impunity. (Dkt. 273-5 at 22.) Dr. Alpert reviewed Ms. Allgood's report, the CPD Rules of Conduct, and the operative complaints in forming his conclusions. (*Id.*) Dr. Alpert did not review any of the underlying CRs, has not conducted any research related to policing in Illinois, and cannot verify any of Ms. Allgood's calculations. (Dkt. 273-5; Dkt. 279-5 at 6.)

Chicago argues that Dr. Alpert's testimony should be barred because he is not qualified to review an epidemiologist's work,[7] his opinion is duplicative as it solely relates to his evaluation of Ms. Allgood's report, it will not assist the trier of fact because he did not conduct his own methodology, and it would unduly prejudice and confuse the jury in violation of Rule 403. (Dkt. 279.) Plaintiffs respond that Dr. Alpert should be allowed to testify because as a criminologist with extensive relevant experience, including experience related to codes of silence, he is qualified to review Ms. Allgood's report and such an opinion would assist the trier of fact. (Dkt. 279 at 9-10.)

Generally, "Rule 702 requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue, which goes primarily to relevance." *See, e.g., Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4417257, at *5 (N.D. Ill. Aug. 19, 2016) (citation omitted) (holding that an expert cannot merely bolster the testimony of another witness, but he can testify that, based on his specialized experience, certain testimony might "have greater reliability"). "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Id.* (quoting *Stuhlmacher v. Home Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014)). Additionally, "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014).

In this case, Dr. Alpert's testimony will not aid the trier of fact. As Dr. Alpert concedes, he was retained for a narrow purpose, to review and opine on the reasonableness and appropriateness of Ms. Allgood's statistical report and conclusions. The Court has already made a determination that Ms. Allgood used widely accepted and reliable methods when conducting

---

[7] This argument can be summarily rejected. While Ms. Allgood works as an epidemiologist, here report is grounded in statistics and data analysis of police data, an area that Dr. Alpert would be qualified to review.

her statistical analysis. His opinion on this point would do nothing but unnecessarily bolster her testimony. *See, e.g., Frerck v. Pearson Educ., Inc.*, No. 11 C 5319, 2014 WL 477419, at \*4 (N.D. Ill. Feb. 6, 2014); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009) ("it is the jury's role to determine the credibility of the witnesses and weigh the evidence."); *Underhill v. Coleman Co.*, No. 3:12-CV-129-JPG-DGW, 2013 WL 5399941, at \*3 (S.D. Ill. Sept. 26, 2013), *aff'd sub nom. Underhill v. Coleman* Co., Inc., No. 12-CV-129-JPG-DGW, 2013 WL 6068479 (S.D. Ill. Nov. 18, 2013) (striking expert testimony regarding the qualifications of another expert). Furthermore, contrary to Dr. Alpert's report, the Court also determined that Ms. Allgood was not qualified to provide her qualitative conclusions because they lacked sufficient foundation. Because those conclusions are excluded, Dr. Alpert's testimony on the topic has no place at a jury trial.[8]

Finally, Dr. Alpert concluded that Ms. Allgood's report was sound and her conclusions reasonable but he did not validate her results, did not examine any of the underlying data, has not performed any research related to the CPD, and explicitly declined to adopt her conclusion that CPD officers drive with impunity. (*See, e.g.*, Dkt 273-5 at 64:12-21.) For these reasons, his testimony will be excluded.

### C. City of Chicago's Motion to Bar Opinion of Lou Reiter (Dkt. 274)

---

[8] Based on his extensive and impressive credentials, it is clear that Dr. Alpert is qualified to opine on a variety of topics germane to this lawsuit. These credentials, however, cannot overcome the limited scope of his retention, his lack of meaningful analysis, and his report's lack of relevancy to the matters at hand. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 537 (7th Cir. 2000) ("[T]his court treats the reliability of an expert's opinion in a particular case separately from his or her overall qualifications."); *see also Clark v. Takata Corp.*, 192 F.3d 759 n.5 (7th Cir. 1999) ("[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir.1998) ("It is true that Dr. Nelson has impressive credentials . . . . But the fact is that he did no testing on these products.... And we have sanctioned the exclusion of speculation offered by persons with credentials as impressive as those of Dr. Nelson."); *Minasian v. Standard Chartered Bank PLC*, 109 F.3d 1212, 1216 (7th Cir.1997) (warning that judges should "not be deceived by the assertions of experts who offer credentials rather than analysis").

Chicago has also moved to exclude the testimony of Plaintiffs' third proposed expert, Lou Reiter. Mr. Reiter is prepared to testify that at the time of Frugoli's accident in 2009, there were failures in CPD field supervision, field management, and administrative investigation systems, and that the department employed a code of silence, which extended to incidents involving alcohol. (Reiter Dep at 35:4-7; 87:12-88:5; 91:5-21.) Mr. Reiter is also prepared to testify that those factors were the proximate causes in Frugoli's drunk driving accident in April 2009. (Dkt. 275-1 at 8; Reiter Dep. At 81:3-82:10.)

Mr. Reiter is a former Deputy Chief of Police in the LAPD, and for the last thirty-four years he has provided law enforcement consultation in police training and management on a variety of topics, including police discipline and supervisory techniques. (Pl. SOAF ¶ 25; Dkt. 275-1 at 1-2.) Mr. Reiter also performs internal audits for police organizations on a variety of topics, such as discipline, internal affairs, and early warning systems. (Dkt. 275-1 at 2.) Mr. Reiter has been involved as an expert in fifteen litigation matters involving the CPD, including four in which the City retained him as an expert. (Pl. SOAF ¶ 25; Dkt. 275-1 at 7.) Mr. Reiter has also testified in five prior cases involving the investigative and personnel practices of the CPD. (Pl. SOAF ¶ 26.) Through his involvement in those cases, Mr. Reiter has become familiar with CPD personnel, its disciplinary system, and numerous studies and commissioned reports regarding the agency. In his preparation for this matter and others, he also reviewed a wide range of CR files and studied the historical presence and impact of the code of silence in the CPD. (Dkt. 275-1 at 7.) He has also previously testified at trial in a case regarding a code of silence in the CPD—*Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *1 (N.D. Ill. Feb. 23, 2012)—and been retained in at least one other matter involving the CPD's code of silence. *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016).

In preparing his report, Mr. Reiter spent approximately 100 hours reviewing a variety of information related to this matter, including the relevant pleadings and police reports, court files, and various depositions related to Frugoli's various collisions. (Dkt. 275-1 at 4-5; Reiter Dep 23:16-19.) He also reviewed a wide range of CR files, including CR files involving allegations of CPD personnel being intoxicated on and off duty, those related to the use of force, and all complaints involving Frugoli. (*Id.*) Mr. Reiter based his opinions on his review of the documents in conjunction with the totality of his knowledge in the field of police practices, which is based on his personal experience as a police office, training, and knowledge of generally accepted practices. (*Id.* at 5.)

In the files Mr. Reiter reviewed, CPD officers who were investigated for DUI by the CPD were involved in a collision and were never investigated following routine traffic stops, a practice he believes illuminates the code of silence. (*Id.*) Reiter also notes unusual investigation delays by the CPD in DUI cases involving CPD officers and several instances where a CPD officer likely should have observed symptoms of the use of alcohol in a fellow officer but denied observing signs of alcohol use in another officer. (*Id.*) After reviewing Frugoli's CRs, Mr. Reiter notes the lack of discipline or even investigation into eighteen separate complaints against Frugoli. Mr. Reiter also focuses on Frugoli's January 28, 2008 traffic incident—where he broadsided a CPD squad car—as indicating numerous failures by the CPD to properly respond or investigate potential misconduct by an officer. The accident also evidences CPD's code of silence to Mr. Reiter because Sgt. Smith-Cotter failed to administer an intoxication test and otherwise acted to keep all other officers away from Frugoli during the investigation. (Dkt. 275-1 at 17-18.)

Chicago argues that Mr. Reiter's opinions are not supported by any facts, data, or evidence; it is not the product of any reliable principles or methods; and it merely consists of speculation and his personal opinion, which will confuse and unfairly prejudice the jury.[9] (*Id.*) Chicago also argues that his opinion regarding proximate causation "as to what a reasonable officer in Frugoli's position would do or think at the time of the accident is irrelevant and invades the province of the jury." (Dkt. 275 at 7-8.) For the reasons detailed below, Chicago's motion to bar is granted in part and denied in part.

### 1. Mr. Reiter's Proffered Testimony Regarding Proximate Causation

The City argues that Mr. Reiter's opinion regarding the proximate cause of the accident should be excluded because it invades the province of the jury. (Dkt. 275 at 7.) "When an expert offers an opinion relevant to applying a legal standard . . . the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez v. City of Chicago*, 732 F.3d 721 (7th Cir. 2013) (quoting *West v. Waymire,* 114 F.3d 646, 652 (7th Cir.1997)). The Seventh Circuit recognizes that "[i]t is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law . . . accordingly, an expert may not offer legal opinions." *Id.*, 732 F.3d at 721; *see also Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) (affirming exclusion of expert whose "proffered testimony was largely on purely legal matters and made up solely of legal conclusions").

As discussed below, although Mr. Reiter's testimony about the existence of a code of silence in the CPD and the presence of failures in the CPD's field supervision, field

---

[9] Although Chicago's motion includes a detailed legal standards section, its argument section regarding Mr. Reiter is devoid of case citations or any cites to the record. Instead, the City makes a series of conclusory statements regarding the admissibility of Mr. Reiter's testimony. *See Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (explaining that failure to cite legal support or otherwise develop argument results in waiver).

management, and administrative investigations are admissible, his opinion that those factors were the proximate cause of Frugoli's drunken driving accident in April 2009 does not satisfy Rule 702 or *Daubert's* strictures. The conclusion that those factors proximately caused Frugoli's accident is a purely legal one, as proving that a widespread CPD policy or practice was the moving force behind Frugoli's accident is an element of proof for Plaintiffs' *Monell* claim. *See, e.g., Sanders*, 2016 WL 4417257, at *6 (excluding testimony of expert who was going to testify that "there was probable cause to arrest [Plaintiff] because it is a legal conclusion, which is outcome determinative because probable cause is a necessary element of [Plaintiff's] common law malicious prosecution claim."). Additionally, it is the jury's job to determine what proximately caused the decedents' constitutional deprivation, and testimony by Mr. Reiter on proximate causation could confuse or prejudice them. *Id.* (expert testimony that "Defendants' conduct was consistent with 'legal mandates' is not only outcome determinative as related to [Plaintiff's] constitutional claims, but these legal conclusions have the real potential of confusing or misleading the jury.") (internal citation omitted).

### 2. Mr. Reiter's Methodology

Neither party disputes that Reiter is qualified as an expert to testify to law enforcement matters. Rule 702 allows a witness to be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. As described above, his credentials are exemplary and include twenty years of experience as a police officer and his work over the last thirty-four years consulting in over one thousand police-related cases. Nevertheless, even qualified experts may not merely assert a "bottom line" or provide testimony based on subjective belief or speculation. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). The reliability of an expert's testimony rests on the "validity of the methodology

employed by [the] expert." *Manpower, Inc.*, 732 F.3d 806; *see also Metavante*, 619 F.3d at 761 (noting that Rule 702 requires "that the expert explain the 'methodologies and principles' that support his opinion").

The City summarily argues that Mr. Reiter's testimony does not meet this reliability standard because "[h]is opinion is not supported by any facts or data and is not the product of any reliable principles or methods."[10] (Dkt. 275 at 7.) The City further argues that Reiter provides "no foundation for his opinion and he did not perform any independent research." (Dkt. 275 at 7-8.) The City's final attack on Mr. Reiter's methodology is that he "completely disregards the actual evidence in this case and instead speculates to the contrary" so that there is "an analytical gap between the underlying facts and [his] opinion." (Dkt. 275 at 7-8.)

To begin, the Court notes that in *Obrycka*, the district court examined similar expert testimony from Mr. Reiter[11] using similar methodology, and rejected the same argument that Mr. Reiter's conclusions were not "the product of his own objective and independent investigation." No. 07 C 2372, 2011 WL 2633783, at *5 (N.D. Ill. July 5, 2011). In that case, the court admitted Mr. Reiter's testimony regarding the existence of a code of silence on the basis that his "expert report and his deposition testimony demonstrate that his opinions are grounded in his significant personal experience and knowledge as well as from his review of the materials related to this case." *Id.* That rationale applies here as well.

Yet, this Court need not rely on *Obrycka* to find that Mr. Reiter's conclusions are founded on a sufficiently reliable methodology. In evaluating whether an expert's proposed

---

[10] The Court will only evaluate the reliability of Mr. Reiter's methodology to his conclusions regarding the existence of a code of silence in the CPD and failures in CPD's internal investigations and supervision systems, as the Court has already found that Mr. Reiter's conclusion regarding proximate cause is inadmissible under Rule 702.

[11] In *Obrycka*, Mr. Reiter testified that "the CPD has created an organizational environment where the Code of Silence and deficient administrative investigations and disciplinary procedures are present and would allow police officers to engage in misconduct with little fear of sanction."

testimony meets the *Daubert* standard, the Court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire Co.*, 526 U.S. at 152). The Seventh Circuit has determined that the critical metric is whether there is a sufficient connection between the methodology and the opinion offered; if the opinion is connected to the underlying information "only by the *ipse dixit* of the expert," then it may be properly excluded. *Manpower, Inc.*, 732 F.3d at 806 (quoting *General Electric Co.,* 522 U.S. at 146); *see also Metavante Corp.*, 619 F.3d at 761 (holding that an expert's testimony was reliable because he did more than "simply testify that [the party]'s performance was commercially reasonable because he said so").

Here, Mr. Reiter's opinions regarding the code of silence and procedural failures by the CPD are connected to a long history of personal and professional experience and to a "large body of knowledge and literature" about appropriate practices and standards, to which Mr. Reiter has contributed several publications, in addition to an extensive review of files specific to Frugoli. (Dkt. 275-1 at 6-7.) Furthermore, Mr. Reiter has extensive experience with the CPD's policies and culture, as he was involved in at least fifteen matters involving the department, including three in which he was retained by the CPD. Lastly, Mr. Reiter has testified at trial regarding the existence of a code of silence within the CPD on at least one other occasion and has been qualified to testify one additional time by a court within this district. *Obrycka*, 2011 WL 2633783, at *4-5; *Spalding*, 186 F. Supp. 3d at 917.

Furthermore, in cases where "reliability concerns focus on personal knowledge or experience," the trial court has "broad latitude to determine" whether the specific factors described in *Daubert* are reasonable measures of reliability in a particular case. *Loeffel Steel*

*Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1118 (N.D. Ill. 2005) (citing *Kumho Tire,* 526 U.S. at 153) (admitting testimony from an expert based on his fifty years of experience in the field and his evaluation of the materials related to the case). For the reasons stated herein, the Court finds Mr. Reiter's methodology related to his determinations that there was a code of silence in the CPD, which extended to alcohol related incidents, and that the department had investigative and supervisory failures to be reliable. Although the City may be critical of Mr. Reiter's methodology, it is entitled to cross-examine him on his methods during his testimony as "[t]hese criticisms do not go to admissibility but to the appropriate weight that should be accorded to the evidence." *Metavante Corp.*, 619 F.3d at 762; *see also Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017) ("The determination of which opinion (if any) identifies the most probable cause of an injury is typically a question of weight, not reliability.").

### 3. Mr. Reiter's Testimony Will Assist the Trier of Fact

In addition to arguing, without explanation, that Reiter's testimony lacks a reliable methodology the City also contends that Reiter's testimony will not assist the trier of fact. "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) (citing *Smith*, 215 F.3d at 718). In particular, expert testimony is welcome to assist the trier of fact with technical issues about which laypeople may be unfamiliar. However, "[e]xpert testimony furthers this purpose only if the expert is in fact providing the jury with genuine expertise." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). This Court finds that Mr. Reiter's testimony, as limited by this opinion, will assist the jury. Testimony about the existence of a code of silence in the CPD, which extended to alcohol related incidents, along with details regarding the intricacies of internal police practices, standards for police investigative practices, and testimony illuminating how incidents in this matter deviated

from those standards, are not within the expected knowledge of a layperson and will assist the jury in determining whether a code of silence existed, and if it did, to what (if any) extent it contributed to Frugoli's collision. The Seventh Circuit has specifically allowed similar testimony "regarding relevant professional standards" because it "can give a jury a baseline to help evaluate whether a defendant's deviations from those standards" were severe enough to meet certain legal thresholds. *Jimenez*, 732 F.3d at 721–22 (allowing expert testimony where the expert discussed "the steps a reasonable police investigator would have taken," "the information that a reasonable police investigator would have taken into account as the investigation progressed," and evidence indicating that police officers "departed from reasonable investigation methods," but where the expert did not "try to resolve conflicts in the testimony of different witnesses" or "offer an opinion regarding whether the police had probable cause"). As noted above, the City may still challenge Mr. Reiter's assumptions, methodology, and conclusions through cross-examination. *See e.g. Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431-32 (7th Cir. 2013); *see also, e.g., EEOC v. DHL Express,* No. 10 C 6139, 2016 WL 5796890, at *9 (N.D. Ill. Sept. 30, 2016).

### 4. Mr. Reiter's testimony will not prejudice or confuse the jury

Again, without elaboration, the City also argues that Mr. Reiter's testimony would "unduly prejudice and confuse the jury in violation of Rule of Evidence 403. (Dkt. 275 at 8.) Under Rule 403 "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger" of unfair prejudice, among other things. Fed. R. Evid. 403. When faced with a more articulated challenge by New York City, the Second Circuit upheld the inclusion of testimony regarding a code of silence in the New York Police Department because the probative value of the testimony "far outweighed any minor prejudice that" might have occurred. *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 359 (S.D.N.Y. 2001), *aff'd in part sub nom.*

*Krohn v. N.Y. City Police Dep't*, 60 F. App'x 357 (2d Cir. 2003), *and aff'd sub nom. Krohn v. N.Y. City Police Dep't*, 372 F.3d 83 (2d Cir. 2004). Here, the probative value of the testimony has been detailed above and the City has failed to explain with any modicum of detail the danger of prejudice or confusion that Mr. Reiter's testimony will pose to the jury. Furthermore, when, as in this case, the expert's methodologies have been deemed reliable, testimony is typically only excluded when it is overly complex, confusing, or hyper-technical. *Stollings.*, 725 F.3d at 766 ("If the judge believes expert testimony is too complex for the jury to appreciate important issues of reliability, such that admitting the testimony would prejudice the opposing party, the judge remains free to exclude such evidence under Rule 403.") (internal citations omitted); *ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 896 (7th Cir. 2011) (holding that "[i]f a party's lawyer cannot understand the testimony of the party's own expert, the testimony should be withheld from the jury. Evidence unintelligible to the trier or triers of fact has no place in a trial."). Here, the City has failed to make any showing that Mr. Reiter's proposed testimony would be prejudicial, confusing, or otherwise should be excluded under Rule 403. Lastly, to the extent the City continues to believe Mr. Reiter's opinion could confuse or mislead the jury or otherwise be prejudicial, it may propose an appropriate limiting jury instruction before trial.

## II.   CHICAGO'S MOTION FOR SUMMARY JUDGMENT

### SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). A genuine dispute of material fact exists if, based on the evidence, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party

bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must set forth facts that show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255. Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## DISCUSSION

A plaintiff may recover under 42 U.S.C. § 1983 where he or she can show that a defendant not only violated his or her constitutional rights but also that any violation harmed the plaintiff. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). Section 1983 "creates a cause of action against '[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Id.* (quoting 42 U.S.C. § 1983) (alteration in original). Prior to *Monell*, plaintiffs could not recover damages for claims against a municipality for constitutional torts. *Monroe v. Pape*, 365 U.S. 167 (1961). In *Monell*, the Supreme Court overturned *Pape*, holding that local governments were no longer "wholly immune from suit under § 1983." *Monell*, 436 U.S. at 663. Under the *Monell* standard, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury," "the government as an entity is responsible under § 1983." *Id.* at 694. However, the Supreme Court

in *Monell* expressly reserved for future decisions an analysis of the "full contours of municipal liability under § 1983." *Id.* at 695.

Plaintiffs' sole claims for relief against the City are predicated on their respective *Monell* claims. In Count IV of their complaints, the Plaintiffs allege that the CPD's code of silence and its failure to properly investigate and impose discipline for potential misconduct by CPD officers, including Frugoli, were pervasive *de facto* policies, practices, and/or customs that encouraged Frugoli to drive under the influence without fear of official consequence, proximately causing the tragic collision that resulted in Cazares' and Manzera's deaths. (Dkt. 86 at 6-12.)

To succeed on its *Monell* claims, Plaintiffs' must demonstrate "the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012) (quoting *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007)). Under *Monell*, the policy or other governmental custom can be "(1) an official policy adopted and promulgated by [the municipality's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) [a municipal] official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690 and *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009)).

### A. Constitutional Deprivation

Plaintiffs must first show that the decedents suffered a cognizable constitutional deprivation. Plaintiffs allege that the City's *de facto* policies, including the CPD's code of silence, encouraged CPD officers to drive under the influence without fear of consequences,

which violated the decedents' Fourteenth Amendment substantive due process rights to bodily integrity on the night of April 10, 2009. (Dkt. 289 at 7.)

## 1. Acting Under Color of Law

The City first argues that there was no due process violation because Frugoli was off-duty at the time of the accident and consequently was not acting under color of law, a requirement of section 1983. (Dkt. 286 at 4.) The City, however, misconstrues Plaintiffs' constitutional claim.[12] Plaintiffs need not allege that Frugoli was acting under color of law at the time of the accident because in *Monell* claims, the "municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983." *Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir. 1990); *see also, e.g., LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1022 (N.D. Ill. 2015) ("Where a plaintiff alleges that municipal policies are the 'moving force' behind a constitutional injury, the municipality itself is the state actor."); *Almaguer v. Cook Cty.*, No. 08 C 587, 2012 WL 4498097, at *6 (N.D. Ill. Sept. 27, 2012), *on reconsideration in part*, No. 08-CV-587, 2013 WL 388992 (N.D. Ill. Jan. 31, 2013), *and aff'd sub nom. Wilson v. Cook Cty.*, 742 F.3d 775 (7th Cir. 2014), *and aff'd sub nom. Wilson v. Cook Cty.*, 742 F.3d 775 (7th Cir. 2014) (same)*; Obrycka*, 2012 WL 601810, at *6 (same); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1845397, at *2 (N.D. Ill. Apr. 8, 2003) (In a *Monell*

---

[12] In support of its argument, the City cites *Latuszkin v. City of Chicago* for the proposition that Plaintiffs cannot show a constitutional deprivation required by section 1983 because Frugoli was not acting under the color of law at the time of the accident. 250 F.3d 502, 505 (7th Cir. 2001). Their reliance on *Latuszkin*, however, is misguided. In *Latuszkin*, the Seventh Circuit affirmed the dismissal of a *Monell* claim against the City after an off-duty CPD officer struck and killed a pedestrian. *Id.* First, in affirming the dismissal in *Latuszkin*, the Seventh Circuit found that the plaintiff's complaint failed to allege a policy attributable to the City because plaintiff did "not allege any facts tending to show that City policymakers were aware [that officers were drinking or partying in a police department parking lot], or that the activity was so persistent and widespread that City policymakers should have known about the behavior." *Id.* As discussed below, the Plaintiffs have sufficiently alleged that the *de facto* policies, including the code of silence, were sufficiently widespread to be attributable to the City. Additionally the *DeShaney* framework is inapplicable here because Plaintiffs are arguing that the City's de facto policies *caused* the constitutional deprivation rather than *failed to prevent* it from occurring.

claim, "the municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the color of law requirement under § 1983.").

### 2. *DeShaney*

According to Chicago, because Frugoli was not acting under the color of law, the City did not have any affirmative duty to protect the decedents because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."[13] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *see also Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993) ("*DeShaney* and its progeny make it clear that the police have no affirmative obligation to protect citizens from drunk drivers".) This argument fails because *DeShaney* is not the appropriate legal framework with which to analyze Plaintiffs' *Monell* claims, which allege that the City's policies caused the harm.

*DeShaney* and its progeny primarily involve cases where the plaintiff alleges that the state failed to protect him from harm from a non-state actor. *DeShaney* involved allegations that the Winnebago County Department of Social Services violated the petitioner's rights under the substantive component of the Fourteenth Amendment when the agency failed to protect him, then a child, from his father's beatings, which caused him brain damage. *DeShaney,* 489 U.S. at

---

[13] While *DeShaney* holds that the state has no constitutional duty to protect citizens from each other, there are two exceptions to that rule: "(1) when the state has a special relationship with the person . . ., and (2) under the state-created danger exception, [where] liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (citing *Buchanan–Moore v. Cnty. of Milwaukee,* 570 F.3d 824, 827 (7th Cir.2009)) (internal quotations omitted). Chicago contends that Plaintiffs must structure their claim under *DeShaney*'s "state-created danger" exception (Dkt. 286 at 7-8), which requires that "the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Sandage v. Bd. of Comm'rs of Vanderburgh Cty.*, 548 F.3d 595, 600 (7th Cir. 2008). Under the state-created danger doctrine, plaintiffs can only prevail if they prove "(1) the state created or increased a danger to him, (2) the state's failure to protect plaintiff was a proximate cause of his injuries, and (3) the state's failure to protect the individual shocks the conscience." *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 469–70 (7th Cir. 2016) (citing *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817-18 (7th Cir. 2007)). Even if the Court were to assess, the Plaintiffs' evidence under *DeShaney*, The Court notes that there would remain a triable issue of fact regarding whether the City's *de facto* policies put the decedents in danger. (Dkt. 87 ¶¶ 9-15.)

197.  In rejecting the petitioner's claims, the Supreme Court found "that a State's failure to protect an individual against *private* violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.  (emphasis added)

Not surprisingly, due to *DeShaney's* focus on "private" harm, most of the cases cited by the City in support of their *DeShaney* argument involve allegations that a municipal body failed to protect a citizen from harm by a non-state actor.  Unlike the Plaintiffs' allegations here, these cases do not involve allegations that a municipal policy affirmatively caused the constitutional deprivation.  In *Reed*, the plaintiffs alleged that the state failed to protect them from a dangerous situation after the defendant police officers arrested a driver but let his drunk passenger go free, and the passenger subsequently crashed into the plaintiffs' vehicle.[14] 986 F.2d at 1124-25; *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 127 (1992) (evaluating claim that "the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security" and "to warn them about known risks of harm."); *Latuszkin*, 250 F.3d at 504 (the alleged *de facto* policy at issue was based on the City's purported duty to "regulate its officers so as to prevent them from depriving people of their constitutional rights"); *Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997) (claims against school administrator for failure to adhere to a purported "duty to protect" a student).[15]

---

[14] Furthermore, in *Reed*, the court relied on *DeShaney* to assess the plaintiff's claims against the individual defendant officers, not any claim against the municipality. The same is true with several other cases on which the City relies. *See Fields v. Wharrie*, 740 F.3d 1107, 1109 (7th Cir. 2014) (evaluating claims against two prosecutors, no *Monell* claims); *Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997) (Section 1983 claims against school administrator, not municipal body; defendant municipality was not a named defendant when the court drafted its opinion); *Vill. of Arlington Heights*, 2012 WL 1068787, at *9  (*DeShaney* discussed in context of Section 1983 claims against individual officer defendant, not alleged *Monell* claim).

[15] In support of its argument regarding *DeShaney*, the City heavily relies on *Snyder v. City & Cty. of San Francisco*, a district court case from the Northern District of California, which has no precedential value here.  No. C 03-04927 JSW, 2006 WL 889503, at *1 (N.D. Cal. Apr. 6, 2006), aff'd, 288 F. App'x 346 (9th Cir. 2008).

In the instant case, Plaintiffs do not seek compensation under *Monell* because the City failed to protect the decedents from Frugoli. Instead, they argue that the City's *de facto* policies, including the code of silence, *caused* the decedents' constitutional injury. (Dkt. 289 at 7.) Such claims are assessed under the *Monell* framework because the harm was caused by the City, which by its very nature fulfills the "under color of law" requirement.

In further support of the inapplicability of the *DeShaney* analysis to Plaintiffs' claims, in several recent cases, the Seventh Circuit and other courts in this district have declined to analyze *Monell* claims under *DeShaney* where the allegations were predicated on a custom or policy causing the constitutional deprivation. *See e.g. Rossi v. City of Chicago*, 790 F.3d 729, 734, 737 (7th Cir. 2015) (declining to evaluate *Monell* claims that CPD's code of silence "shields police officers from investigation and promotes a culture of misconduct among police that contributed to his assault" under *DeShaney*); *Obrycka*, 2012 WL 601810, at *6 (examined the claims "under the *Monell* framework and not *DeShaney*" where plaintiff alleged that CPD's code of silence caused her constitutional deprivation); *LaPorta*, 102 F. Supp. 3d at 1020 (applying *Monell* framework and failing to discuss *DeShaney* in relation to allegations of municipal liability where the "City's practice of concealing and condoning officer misconduct deprived him of his Fourteenth Amendment rights").

Even if *DeShaney* were applicable to the Plaintiffs' *Monell* claims, a reasonable jury could find that the code of silence and attendant policies "needlessly *create[d]* risks of harm" to the decedents, thus violating their due process rights. *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012). In this case, on-duty police officers on several occasions ignored or otherwise failed to respond to incidents in which a jury could find that Frugoli drove drunk, subsequently damaging property or injuring others. A reasonable jury may find that, failing to discipline or

arrest a police officer who had repeatedly endangered the lives of others, increased the danger to plaintiffs, proximately causing their deaths.

Under Illinois law, police officers are required to request a chemical test when there is probable cause to suspect DUI is a factor when a crash results in personal injury. *See* 625 Ill. Comp. Stat. Ann. 5/11-501.1. Drivers who refuse to submit to the testing have their driving privileges administratively revoked for a minimum of one year. *Id.*; 625 Ill. Comp. Stat. Ann. 5/6-208.1. Therefore, viewing the evidence in the light most favorable to Plaintiffs, if Sgt. Smith-Cotter had administered intoxication tests in line with the injured officer's observations of Frugoli at the time of the accident, the tests would have: (1) definitively ruled out the involvement of alcohol; (2) definitively established that alcohol was involved; or (3) if Frugoli refused the test, he would have had his driver's license administratively revoked. Without any attempts to administer any tests, it would be reasonable for a jury to conclude that Frugoli felt he could drive with impunity after the incident which involved no sustained investigation, no DUI tests, and resulted in no civil penalties or administrative sanction. If Frugoli was an average citizen, not protected by the code of silence, and he tested positive for the significant level of alcohol in his blood, Illinois law would have required that his license be suspended. The average citizen without such protection would not be permitted to drive, or at a bare minimum would be granted a restrictive driving permit that would have done two things: provide notice to his employer of the incident and limit his driving to getting to and from work. A reasonable juror could find that by failing to administer the DUI tests on the scene, failing to arrest and discipline Frugoli, Frugoli was free to drive drunk, during a time when he should have had his license suspended under the law and therefore the City increased the danger to the plaintiffs who were unwittingly stalled in the path of a dangerous individual who caused their deaths.

**B. Existence of Code of Silence and *De Facto* Policies**

In addition to showing that the Plaintiffs suffered cognizable constitutional deprivations, they must also demonstrate that their injury was caused by "a widespread practice that is so permanent and well-settled that it constitutes a custom or usage with the force of law." *Obrycka*, 2012 WL 601810 at *6; *see also Monell,* 436 U.S. at 690–91 ("[L]ocal governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."). In the Seventh Circuit, while "there is no clear consensus as to how frequently [a practice] must occur to impose *Monell* liability," there must be sufficient evidence "that there is a policy at issue rather than a random event." *Thomas* 604 F.3d at 303. Indeed, "the gravamen is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body." *Rossi*, 790 F.3d at 737. Demonstrating that there is a policy at issue "may take the form of an implicit policy or a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference." *Thomas*, 604 F.3d at 303 (internal citations omitted).

As described above, Plaintiffs intend to demonstrate that the CPD has a code of silence "which results in the refusal or failure to report and adequately investigate instances of misconduct, including violations related to incidents of intoxication." (Dkt. 289 at 8-9.) The Plaintiffs argue that the *de facto* policy and code of silence are evidenced and caused by the CPD's failure to: (1) enforce regulations against its own officers related to assaulting citizens and being intoxicated; (2) sufficiently investigate allegations of misconduct; (3) initiate prompt

disciplinary procedures related to alleged misconduct; (4) properly and sufficiently discipline an officer.  (*Id.* at 9.)

The City argues that Plaintiffs' only evidence of any *de facto* custom, policy, or practice, is the proposed testimony of Ms. Allgood, Dr. Alpert, and Mr. Reiter, which they argue is inadmissible.  (Dkt. 286 at 10.)   As discussed above, while Dr. Alpert's testimony has been excluded and some of Ms. Allgood's and Mr. Reiter's conclusions are insufficient under Rule 702 and *Daubert*, there is still sufficient admissible evidence regarding the existence of *de facto* policies in the CPD, including a code of silence, to create a triable issue of fact.  S*ee also, e.g., Spalding*, 186 F. Supp. 3d at 916 (denying summary judgment for City in *Monell* claim involving code of silence because testimony of expert Lou Reiter was sufficient to create a triable issue regarding the existence of a code of silence within the CPD); *Obrycka*, 2012 WL 601810, at *9; *cf. Rossi*, 790 F.3d at 737–38 (affirming summary judgment for City after plaintiff failed to retain a defense expert to show existence of code of silence to support *Monell* claim).

As described in detail above, Mr. Reiter's testimony regarding the existence of a code of silence and administrative failings by the CPD, both generally and with respect to alcohol-related incidents, is sufficient to create a triable issue of fact regarding the existence of a widespread *de facto* policy to support Plaintiffs' *Monell* claim.  In addition to Mr. Reiter's testimony regarding an endemic code of silence within the CPD, he is also prepared to testify regarding its application to alcohol-related incidents.  Based on his review of a sampling of various alcohol-related CRs, Mr. Reiter noted that:  DUI arrests of CPD officers in the City occurred only after collisions instead of routine traffic stops; there were several incidents where CPD officers denied observing what should have been obvious symptoms of intoxication; and there were some

incidents where CPD officers attempted to invoke "professional courtesy" with other law enforcement agencies in an attempt to get out of a DUI. (Pl. SOAF ¶¶ 27-29.)

Furthermore, although her opinions regarding the existence of a code of silence are excluded, Ms. Allgood's statistical findings could support the supposition that a code of silence existed within the CPD in relation to the investigation of alcohol-related incidents involving CPD personnel. Ms. Allgood's analysis revealed that Chicago police officers were most often reported for DUI within the City of Chicago subsequent to incidents that involved vehicular accidents, whereas Chicago police officers outside the city were reported for DUI following routine traffic stops. (Allgood Dep. 240:12-240:17.) Additionally, when DUIs involving CPD personnel were reported in Chicago, the reports were more likely to omit a Breathalyzer or BAC test when compared to similar reports outside of Chicago. (Allgood Dep. 217:10-218:12.) Ms. Allgood also found that, while the DUI arrest rate for the general population of Illinois was 9 per 1,000 drivers, or about 1%, in 2009, the DUI reporting rate for Chicago police officers was only half that (68 out of approximately 13,000 officers). (Allgood Dep. 155:10-161:10.)

This expert testimony is supported by other evidence in the record such that a reasonable juror could consider to infer that there is a code of silence within the CPD that protects officers who are involved in alcohol-related incidents. This evidence includes Sgt. Smith-Cotter's apparent failure to fully investigate two of Frugoli's accidents from January 2008 and the fact that Frugoli was the subject of 18 CRs, comprising 43 distinct allegations of misconduct as a police officer, but none of the CRs were sustained.

Facts following the accident could also support the notion that CPD officers engaged in the code of silence when interacting with Frugoli after his collision on April 10, 2009. Although Frugoli was detained by two CPD officers after he left the scene of the crash, the officers were

38

aware that he was a CPD officer and one later testified that he did not smell alcohol on Frugoli's breath, even though Frugoli's blood alcohol content was later measured at four times the legal limit and the odor of alcohol was later recognized by paramedics who transported Frugoli to the hospital.

Finally, the Mayor's acknowledgement of the existence of a code of silence, along with the findings of the City's Police Force Accountability Task Force and the DOJ's report, provide further, significant evidence regarding the existence of a code of silence within the CPD.

When viewed in the light most favorable to the Plaintiffs, the admissible expert testimony, along with other evidence from the record, there is a genuine issue of material fact as to the existence of a pervasive code of silence and other *de facto* policies within the CPD that would lead Frugoli to believe he could drive drunk without repercussions.

### C. Causation

"The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). Here, to satisfy that requirement, the Plaintiffs must show that the City's *de facto* policies were the "moving force" behind Frugoli's actions. Under this analytical framework, causation of the harm can be attributed the municipality "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (quoting *Monell*, 436 U.S. at 694). Said another way, Plaintiffs must evidence "a direct causal link" between the alleged policy or practice and the constitutional violation. *See, e.g., Obrycka*, 2012 WL 601810, at *9.

The City argues that Plaintiffs' *Monell* claim is an improper attempt to hold it vicariously liable for the acts of its employee because there are no facts to suggest that Frugoli's decision to drive drunk on the night of the accident was caused in any way by any purported *de facto* City policy or a code of silence.  (Dkt. 286 at 11.)  In support, the City posits that there is no evidence that it ever became aware of Frugoli's 2005 accident, and there is no evidence that Frugoli had consumed alcohol prior to either of his January 2008 accidents.  (Dkt. 286 at 12.)

Again, when viewing the evidence in the light most favorable to Plaintiffs, there is sufficient evidence to support a reasonable jury's conclusion that Frugoli's decision to drink and drive on April 10, 2009, was caused by his belief that he was impervious to consequences due to the CPD's administrative lapses and attendant code of silence.  Before the fatal accident, Frugoli had been the subject of numerous citizen complaints, none of which were sustained or resulted in discipline.  Although none of these allegations related to Frugoli's use of alcohol, a reasonable jury could infer that the lack of investigation or discipline resulting from these official investigations led Frugoli to believe that he was immune from discipline for any of his actions, on or off-duty.  Similarly, although the CPD was not aware of Frugoli's 2005 incident which involved alcohol, the lack of investigation by Sgt. Smith-Cotter into Frugoli's two early morning accidents in 2008, and especially her conduct as it related to the second accident, could also support the conclusion that Frugoli believed he could drink and drive with impunity.  The first accident happened while Frugoli was on-duty and crashed his department vehicle.  Although Frugoli denied drinking before this collision, there is no evidence of a fulsome investigation by Sgt. Smith-Cotter, who responded to the scene, which could have conclusively determined whether Frugoli had been drinking or not.  The next night, Frugoli crashed his personal vehicle into a CPD squad car after spending the previous six hours at a casino.  (Dkt. 285-6 at 25.)

Again, even though Frugoli again denied drinking before this incident, a reasonable juror could find the opposite. In addition to being at a casino for six hours, one of the officers who was injured at the scene noticed that Frugoli's eyes appeared glassy and he failed to assist the injured officers, call for aid, or check on their condition.

Sgt. Smith-Cotter's response to Frugoli's accidents could serve to not only bolster the existence of a code of silence but also to support the causal link between the code and Frugoli's decision to drink and drive on April 10, 2009. During the crash investigation by other CPD officers, Frugoli remained in Smith-Cotter's vehicle and was not subjected to any intoxication tests or interviewed by the investigating officers. Although Frugoli was cited for the accident, the injured and investigating officers were not informed of the court date to prosecute the citations against Frugoli. Furthermore, Sgt. Smith-Cotter eventually drove Frugoli home, an admittedly unusual practice. From these facts and based on evidence of at least one other accident where Frugoli was suspected of driving after drinking, a jury could infer that Frugoli had likely been intoxicated at the time of the second accident, and that Sgt. Smith-Cotter's failure to investigate either accident could have engrained in Frugoli the presence of a code of silence and promoted the belief that he could drink and drive with impunity. Couple these facts with the law regarding DUI in Illinois that would have suspended his driver's license if the Chicago police officers who dealt with him on the scene each time, it is even more likely that Frugoli was emboldened by the code of silence enabling him to believe that he was above the law.

Throughout its memoranda, the City makes much of Frugoli's self-serving denials regarding the existence of a code of silence or that it played any role in his decision to drive drunk on April 10, 2009. (Dkt. 286 at 13.) A reasonable jury could find that it is not surprising

or inconsistent with the Plaintiffs' claims that Frugoli denied the existence of the code of silence or its effect on his decision to drive drunk on April 10, 2009. As Mr. Reiter has pointed out, the CPD has made a "conscious choice to deny the potential existence and impact of the Code of Silence in its administrative investigations and training of its police personnel" and has chosen not include a metric to determine if CPD personnel have complied with their obligation to report officer misconduct. (Dkt. 275-1.) By denying its existence and impact, both the CPD and Frugoli could be found to be supporting and perpetuating the code. *See Spalding*, 186 F. Supp. 3d at 917.

The City also attempts to distinguish this case from *Obrycka*, where the court found that there were genuine issues of material fact as to causation regarding the plaintiff's *Monell* claim. (Dkt. 286 at 13-14.) In *Obrycka*, the plaintiff's *Monell* claim was also predicated on the existence and impact of CPD's code of silence with respect to CPD officer, Anthony Abbate, who beat a female bartender while off-duty. In that case, prior to beating the bartender, the officer told the bartender that "nobody tells me what to do," harassed other bar patrons, repeatedly yelled "Chicago Police Department" while flexing, and made numerous calls to other officers after the incident. *Obrycka*, 2012 WL 601810, at *9.

First, by their very nature, *Monell* claims regarding codes of silence necessarily involve the underreporting or cover-up of misconduct by police officers. Thus, in many cases, it would be surprising to have direct evidence of the implementation, effect, or even existence of the code. This is compounded, as Mr. Reiter has submitted when the CPD and its officers, like Frugoli has done here, consistently deny the existence of the code. As courts within this district have noted, these types of cases necessarily rely on circumstantial evidence, including statistics. Second, as

discussed above, Plaintiffs have submitted sufficient evidence regarding the existence of the code and its potential impact on Frugoli to create triable issues of fact.

When construing all facts and reasonable inferences in Plaintiffs' favor, there is a genuine issue regarding whether the City's *de facto* policies, including the code of silence caused Plaintiffs' constitutional deprivations. This is especially true considering that after making a threshold showing of the existence of a widespread policy "the jury must make a factual determination as to whether the evidence demonstrates that the [City] had a widespread practice that [caused] the alleged constitutional harm." *Thomas*, 604 F.3d at 303.

### D. Culpability and Deliberate Indifference

In passing, the City argues that in order to demonstrate that it is culpable, Plaintiffs must establish that the City was "deliberately indifferent as to [the] known or obvious consequence" of its *de facto* policies. (Dkt. 286 at 10 quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).) Plaintiffs fail to address the applicability of this standard but their response also cites it in its legal standards section. (Dkt. 289 at 7, 8.) Although the "deliberate indifference" standard is typically applicable in *Monell* cases involving allegations of an inadequate policy, such as failure to train, supervise, or discipline, courts within the Northern District have come to different conclusions on its application to allegations regarding the code of silence. [16] *Compare Spearman v. Elizondo*, No. 15 C 7029, 2016 WL 1730650, at *3 (N.D. Ill. May 2, 2016) ("In

---

[16] The Supreme Court first delineated the "deliberate indifference" standard in *City of Canton, Ohio v. Harris*, where the Court recognized a *Monell* claim based on allegations that an employee has not been adequately trained or inappropriately instructed, and a constitutional wrong has been caused by that failure. 489 U.S. 378, 387 (1989). In that case, the Court specifically noted that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. Federal courts across the country, including courts within this district, have expanded the holding in *City of Canton* to apply equally to "failure-to-discipline" cases. *See e.g. Sigle v. City of Chicago*, No. 10 C 04618, 2013 WL 1787579, at *2 (N.D. Ill. Apr. 25, 2013) (noting that "the failure-to-discipline or -supervise theory can support 'a finding of municipal liability because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts,' but only if the plaintiff can show "deliberate indifference" on the part of the City) (quotation omitted).

order to establish that the code of silence is attributable to the City, Spearman must show that City policymakers were deliberately indifferent as to [the policy's] known or obvious consequences.") (quotation omitted) *with Obrycka*, 2012 WL 601810, at *10 (finding that deliberate indifference standard did not apply to plaintiff's code of silence claims because she alleged that the "de facto policy of impeding and interfering with police misconduct investigations and that this policy, along with the code of silence, directly caused her constitutional injury"). Even though Plaintiffs' ultimate allegations are that the CPD's code of silence was the moving force behind Frugoli's decision to drink and drive, much of the supporting evidence regarding the existence of a code of silence claim involves investigative and disciplinary policy failures. As a result, for purposes of this motion, the Court will assess whether the City was deliberately indifferent to the consequences of the *de facto* policies at issue.

Under *Monell*, to be considered deliberately indifferent, the municipality must "have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303 (internal citations omitted). Flawed procedures are not enough in this Circuit to show deliberate indifference;[17] a municipality may only be held liable for imperfect police practices or customs when plaintiffs can "demonstrate 'tacit authorization by city policymakers.'" *See Sigle*, 2013 WL 1787579, at *2 (citing *Kindle v. City of Harvey,* No. 00 C 06886, 2002 WL 230779, at *4 (N.D.Ill. Feb.15, 2002)); *see also, e.g., Green v. City of Chicago*, No. 11 C 7067, 2015 WL 2194174, at *8 (N.D. Ill. May 7, 2015) (holding that a city's failure to investigate, supervise, and discipline its officers can support "a

---

[17] The Court also notes that the City discusses deliberate indifference in reference to the alleged policy or practice of failing to discipline officers for drinking and driving. The correct analysis is to determine whether a widespread practice or custom, when enforced, evidences a deliberate indifference to the rights of a municipality's citizens. If the policy or custom results in the City's deliberate indifference to these rights, then the City will be held liable under *Monell*.

finding of municipal liability because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts" so long as the plaintiffs show deliberate indifference by the city).

For many of the same reasons that apply to the analysis above, Plaintiffs have presented sufficient evidence to create a triable issue as to whether the City was deliberately indifferent to the consequences of the CPD's code of silence. In addition to the evidence discussed above, Mr. Reiter points to the City's and CPD leadership's longstanding denials regarding the existence and potential impact of the code in the course of its training and internal investigations, along with the decision to not categorize evidence of the code of silence in the CPD's internal metrics as actions which served to promote and perpetuate the code. (Dkt. 290-13 ¶¶ 42-46, 53.) Mr. Reiter's expert report also explicitly opines that this widespread failure to acknowledge the code of silence and take affirmative steps to eliminate or minimize it is a conscious choice by CPD leadership representing deliberate indifference to the issue by the City. (Dkt. 290-13 ¶ 34.) This is sufficient evidence to create a jury issue on the matter.

## CONCLUSION

For the reasons stated herein, the testimony of Dr. Alpert is excluded and the testimony of Ms. Allgood and Mr. Reiter are limited as set forth herein. Additionally, Chicago's Motion for Summary Judgment is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 3/31/2017